UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANGHAI SELECT SAFETY PRODUCTS COMPANY LIMITED, SELECT (NANTONG) SAFETY PRODUCTS COMPANY LIMITED, and SELECT PROTECTIVE TECHNOLOGY (HK) LIMITED<br><br>     *Plaintiffs*,<br><br>          v.<br><br>UNITED STATES OF AMERICA; U.S. DEPARTMENT OF HOMELAND SECURITY; and U.S. CUSTOMS AND BORDER PROTECTION,<br><br>     *Defendants*. | Court No.: 26-02592<br><br>**CONFIDENTIAL VERSION** |

## COMPLAINT

Shanghai Select Safety Products Company Limited ("**Shanghai Select**"), Select (Nantong) Safety Products Company Limited ("**Nantong Select**"), and Select Protective Technology (HK) Limited ("**Hong Kong Select,**" together with Shanghai Select and Nantong Select, the "**Plaintiffs**" or "**Select Group**"), by and through counsel, bring this Complaint against Defendant United States of America, Defendant U.S. Department of Homeland Security ("**DHS**"), and Defendant U.S. Customs and Border Protection ("**CBP**" collectively, "**Defendants**"), and allege as follows:

## SUMMARY OF THE ACTION

1.     This action challenges Defendants' decisions to take certain adverse action against Plaintiffs, purportedly under the authority of Section 307 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1307 ("**Section 307**"), and its implementing regulations, to subject Plaintiffs to an

arbitrary and capricious process to administratively challenge that adverse action, and to unreasonably delay a decision on Plaintiffs' administrative challenge to that adverse action.

2. In April 2024, Defendant CBP publicized a withhold release order ("**Order**") providing for the administrative seizure of all work gloves exported by Plaintiffs into the United States. The Order stated that it was "based on information that reasonably indicates the use of convict labor in violation of 19 U.S.C. § 1307 in the production of that merchandise.…"

3. The Order followed reporting that inmates at Chishan Prison in the People's Republic of China alleged that they had been forced to make gloves bearing the popular U.S. brand "Milwaukee Tool." These allegations were first made by the Business and Human Rights Resource Centre ("**BHRRC**"), a global non-profit, in December 2022. BHRRC reached out to Milwaukee Tool and to U.S. retailers of Milwaukee Tool products for comment. Milwaukee Tool conducted its own audit and issued a response, stating that "[a] thorough investigation of these claims was conducted, and we have found no evidence to support the claims" that any gloves being sold by Milwaukee Tool had been made by forced labor.

4. Plaintiffs are a large PRC-based designer and manufacturer of safety equipment, including work gloves, and have for years been a supplier of Milwaukee Tool-branded gloves to the U.S. company that sells them. Plaintiffs were nowhere mentioned in BHRRC's December 2022 report. In May 2023, a Wisconsin-based online newspaper, Wisconsin Watch, rehashed the same allegations, with the article's author alleging for the first time that this forced labor had been subcontracted to the prison by Plaintiffs. The article's author offered no evidence to support these allegations other than regulatory filings identifying Plaintiffs as a Milwaukee Tool supplier and hearsay statements from two prisoners that they recognized the name "Shanghai Select."

5. After CBP published the Order, Plaintiffs' counsel asked CBP whether the "information" on which the Order was purportedly based was simply the unsubstantiated hearsay allegations in the article, such that Plaintiffs could focus on disproving them. CBP refused to answer, and indeed CBP has refused for nearly two years to identify whether it ever conducted any additional investigation or adduced any facts beyond the unsubstantiated, hearsay allegations in the article.

6. Plaintiffs engaged their own third-party auditor who, similar to Milwaukee Tool, found the allegations in the Wisconsin Watch article to be without merit. Indeed, Plaintiffs are industry leaders in the design, development, manufacturing, and distribution of a comprehensive range of protection products and solutions, and they have for years at the request of their customers in the U.S. and Europe been routinely subjected to random on-site inspections, including annual inspections and audits by Supplier Ethical Data Exchange ("**Sedex**"), a global non-profit organization that enables businesses to collaborate to improve social and environmental performance and working conditions throughout global supply chains. Since 2019, Plaintiffs have undergone Sedex Members Ethical Trade Audit ("**SMETA**") audits, which are widely recognized industry standards designed to help identify and prevent unsafe working conditions, excessive working hours, discrimination, inadequate pay, and forced labor. None of the audits identified any indicators of forced labor at Nantong Select, Plaintiffs' in-house manufacturing facility.

7. In all likelihood, the prisoners in Chishan were being forced to make counterfeit gloves. Indeed, the author of a tool-focused blog, Toolguyd, would later disclose that the same reporter had contacted him and admitted that they had no evidence that Plaintiffs were involved and indeed no evidence that the gloves at issue were not counterfeit. A number of statements in the article were moreover at odds with easily provable facts or otherwise cast doubt on Plaintiffs'

involvement. For example, Chishan is nearly 1,000 miles away from Plaintiffs' only factory. The prisoners stated that they were forced to produce thick winter models of gloves that Plaintiffs do not and have never been asked to manufacture. After the article's author apparently provided the name "Shanghai Select" to the inmates, an inmate claimed to have seen "purchase orders" with the words "Shanghai Select" on them. But Plaintiffs do not conduct their purchasing activity under that trade name, but rather under the name of Select Group's contracting entity "Select Protective Technology (HK) Limited."

8. With nothing but vague, broad allegations of "convict labor" to support the Order, CBP informed Plaintiffs' counsel that, rather than simply addressing the hearsay allegations in the Wisconsin Watch article, the only way to administratively challenge the Order would be to submit a petition and evidence that would affirmatively disprove the existence of forced labor anywhere within Plaintiffs' supply chain, without any product limitation and over a multi-year period. Such a process is nowhere stated in any applicable regulation or law. Rather, CBP has taken the position that the defined process applicable to importers challenging detention of a specific shipment should apply to exporters' entire business. Such a requirement is effectively an overly burdensome audit of Plaintiffs' business, not reasonably related to any particular allegation, and therefore arbitrary and capricious.

9. Notwithstanding the arbitrary, capricious, and undue evidentiary burden placed on Plaintiffs, Plaintiffs nevertheless endeavored to demonstrate both the falsity of the article's allegations as well as the absence of forced labor in their U.S.-bound glove production to CBP. Plaintiffs put together a nearly 100-page petition, and between July 2024 and March 2026, Plaintiffs produced more than 48,000 pages of documentary evidence. Among many other records, these included all purchase orders and sales records for Milwaukee Tool-branded gloves between

2019 and 2024, showing that—contrary to the allegations in the article—they say "Select Protective Technology (HK) Limited," *not* "Shanghai Select" on them; hand-written records tracking the entire production lifecycle of the gloves manufactured to fill certain of those orders, from raw materials procurement through exportation to the United States; employment and payroll records from 2019 through 2024 demonstrating that Plaintiffs were employing, paying salaries to and providing benefits to hundreds of individuals to manufacture gloves; video recording of Plaintiffs' production line taken prior to the issuance of the Order showing those employees doing the work that the article claimed without basis had been performed by prisoners almost 1,000 miles away; Sedex SMETA audit reports from 2019 through 2025 showing no findings whatsoever of forced labor; Plaintiffs' third-party audit report following the article's publication also finding no evidence of forced labor; Plaintiffs' export agents' shipping records showing that the gloves were being shipped out of Shanghai port, close to Plaintiffs' single factory, rather than other ports closer to the prison; and Plaintiffs' and their suppliers' forced labor policies, procedures and certifications.

10.     CBP has notably issued no finding in the past two years of any use of forced labor by Plaintiffs, not even after demanding and receiving tens of thousands of pages of documentation. Despite no such finding and despite no apparent factual justification for the Order, CBP has only made broader demands for documents and has continued to delay issuing a decision on Plaintiffs' petition for relief.

11.     CBP's actions have caused significant harm to Plaintiffs, including economic and reputational damages, among other serious injuries. Defendants' conduct violates the Administrative Procedure Act's requirement of reasoned decision-making, lacks evidentiary support, and is contrary to law, thereby necessitating judicial intervention.

12. CBP has acted unlawfully with respect to Select Group over the past two years. *First*, CBP has failed to provide any evidentiary basis for issuing the Order against Select Group, or for applying the Order to all work gloves rather than Milwaukee Tool-branded gloves. *Second*, CBP has subjected Plaintiffs to an unduly burdensome administrative challenge process that is both unsupported by law and arbitrary and capricious under the APA. *Third*, CBP lacks any legal justification for its prolonged and indefinite delay in adjudicating Select Group's petition.

13. For all of these reasons, this Court should require CBP to produce the administrative record with respect to its issuance of the Order and should further vacate the Order.

**PARTIES**

14. Shanghai Select Safety Products Company Limited is a limited liability company that is organized and exists under the laws of the People's Republic of China ("**PRC**"). Shanghai Select is located at Room 1508, Huahong Business Center, No. 5 Lane, 388 Daduhe Road, Putuo District, Shanghai City, Shanghai City, PRC. Shanghai Select is the industry leader in the design, development, manufacturing, and distribution of a comprehensive range of protection products and solutions. In addition to the design and manufacturing of hand protection products, Shanghai Select provides a diversified range of body protection products such as arm protection, body protection, foot protection, and respiratory protection.

15. Select Protective Technology (HK) Limited is a wholly owned subsidiary of Shanghai Select and is organized and exists under the laws of the Hong Kong Special Administrative Region. Hong Kong Select is located at Room 401, 4/F, Wangchai Central Building, 89 Lockhart Road, Wan Chai, Hong Kong. Hong Kong Select is responsible for negotiating and executing overseas purchase orders or agreements, including all agreements for the purchase of Milwaukee Tool-branded gloves.

16. Select (Nantong) Safety Products Company Limited is a wholly owned (directly and indirectly) subsidiary of Shanghai Select and is organized and exists under the laws of the PRC. Nantong Select is located at 198 Youyi West Road, Rudong Economic Development Zone, Rudong County, Nantong City, Jiangsu Province, PRC. Nantong Select serves as an in-house manufactory that produces the goods in accordance with the purchase orders and agreements executed by Hong Kong Select.

17. Defendant the United States of America is the statutory defendant under 5 U.S.C. § 702 and this Court's jurisdictional grants in 28 U.S.C. § 1581.

18. Defendant Department of Homeland Security is a federal agency headquartered in the District of Columbia with its principal office located at 245 Murray Lane S.W., Washington, D.C. 20528.

19. Defendant U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia with its principal office located at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229. CBP is an agency within DHS. Among its duties, CBP enforces federal laws regulating the importation of goods into the United States.

## **JURISDICTION AND VENUE**

20. This Court has jurisdiction under 28 U.S.C. § 1581(i).

21. Section 1581(i)(1), (C) and (D) provide:

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . .
>
> (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety. . .

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section.

22. Section 307 (19 U.S.C. § 1307), the statute implicated in this matter, is a law of the United States providing for an embargo or other quantitative restriction (of zero) on the importation of merchandise for reasons other than the protection of the public health or safety. The Order at issue in this matter was issued pursuant to Section 307 of the Tariff Act of 1930, and this Court has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i) as Section 307 provides for embargoes.

23. Plaintiffs' claims in this action are not within this Court's grants of jurisdiction in 28 U.S.C. § 1581(a) through (h).

24. This action arises under the Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 702-706, and 19 U.S.C. § 1307. *See* 28 U.S.C. § 2640(e) (providing that actions under this Court's jurisdiction in 28 U.S.C. § 1581(i) are reviewed as provided in 5 U.S.C. § 706). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

25. CBP's Order subjected Select Group's U.S. glove exports to detention without adequate evidentiary basis and without providing any reasoned justification or disclosing any supporting evidence, and thus constitutes arbitrary and capricious agency action in violation of the APA. 5 U.S.C. § 706.

26. CBP's demand, found nowhere in law, that Select Group be put to the burden of affirmatively demonstrating the absence of forced labor in its entire supply chain across all glove products, without any clear allegation of wrongdoing in the Order, without any connection to the

vague allegation in the Order, and without CBP supplying any evidence whatsoever supporting the allegation in the Order, constitutes arbitrary and capricious agency action in violation of the APA and action contrary to procedure required by law. *Id.*

27. CBP's continuing delay in adjudicating Select Group's petition administratively challenging the Order, and its failure to address the evidence submitted by Select Group that the allegations in the article are without merit and demonstrating that its entire glove production process occurs at Plaintiffs' factory, rather than at Chishan Prison, are unreasonable and unlawful. Such indefinite delay is arbitrary and capricious and violates the APA. *Id.*

## STANDING

28. Select Group is the subject of the Order and the entity that CBP has alleged to be producing merchandise using convict labor.

29. Select Group has standing to file this action because it is "adversely affected or aggrieved by agency action" within the meaning of the APA. 5 U.S.C. § 702; *see* 28 U.S.C. § 2631(i). As a direct result of the Order issued by CBP, Select Group has suffered substantial business losses and reputational harm, which losses and harms are continuing because of Defendants' arbitrary and capricious demand that Select Group effectively audit its entire business and Defendants' unreasonable delay in adjudicating Select Group's petition.

## TIMELINESS AND EXHAUSTION OF REMEDIES

30. A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

31. On April 10, 2024, CBP published the Order and made it effective. This action is therefore filed within two years after the cause of action accrued.

32.     In an action within this Court's jurisdiction in 28 U.S.C. 1581(i), this Court "shall, where appropriate, require exhaustion of administrative remedies." 28 U.S.C. § 2637(d).

33.     In view of the lack of express administrative remedies for exporters such as Select Group and CBP's unreasonable delay in this matter, all appropriate administrative remedies have been exhausted and any further resort to administrative remedies is manifestly inadequate and inappropriate.

## STATEMENT OF FACTS

### Legal Background

34.     Since the enactment of the Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590, federal law has prohibited the importation of any goods or merchandise produced wholly or in part in any foreign country by forced labor. 19 U.S.C. § 1307.

35.     Enforcement of 19 U.S.C. § 1307 is made, *inter alia*, through issuance of Withhold Release Orders ("**WROs**"). Any individual who has "reason to believe that any class of merchandise that is being, or is likely to be, imported into the United States" is being produced by forced labor may communicate that belief to CBP. Port directors and other principal customs officers must report such instances to the CBP Commissioner. Persons outside of CBP may also submit allegations online. Upon receipt, the CBP Commissioner is required to initiate an investigation "as appears warranted" by the amount and reliability of the submitted information. If the Commissioner finds the information "reasonably but not conclusively indicates" that imports may be the product of forced labor, then she or he is to issue an order to withhold release of such goods pending further instructions. 19 CFR § 12.42. CBP issues a "finding" when its investigations determine, based upon probable cause, that forced labor was used in the manufacturing or

production of goods entering the United States and that the merchandise is being, or is likely to be, imported into the United States. *See* 19 C.F.R. § 12.42(f).

36. A WRO allows CBP to detain the products in question at all U.S. ports of entry until/unless importers can prove the absence of forced labor in their products' supply chain. 19 CFR § 12.42(g). While 19 C.F.R. 12.42(g) applies explicitly to importers, CBP has previously treated petitions and information submitted by affected exporters as subject to the requirements of this Section. *See, e.g.*, 86 FR 50725 (Determination That Maintenance of Finding of March 29, 2021, Pertaining to Certain Disposable Gloves Produced in Malaysia, Is No Longer Necessary). In June 2025, CBP issued a "comprehensive guide" on modifying a withhold release order (the "WRO Modification Guide"). *See* Office of Trade, Forced Labor Division, *Withhold Release Order (WRO) and Finding Modifications Guide*, CBP Pub. No. 5040-0525 (June 2, 2025), *available at* https://www.cbp.gov/sites/default/files/2025-05/FLD_Withhold_Release_Order_ and_Finding_Modifications_Guide.pdf

37. The WRO Modification Guide states that "[e]ntities subject to a WRO or Finding may file a petition to request a modification of the WRO or Finding with the Forced Labor Division in CBP's Office of Trade, by submitting information demonstrating the foreign producer has remediated all forced labor conditions in their facilities and/or supply chain, thereby showing that their merchandise is no longer subject to Section 1307." The WRO Modification Guide contains no guidance for a situation, such as this one, in which CBP is mistaken and there is in fact no forced labor condition to remediate.

**Plaintiffs' Business**

38. Plaintiffs are industry leaders in the design, development, manufacturing, and distribution of a comprehensive range of body protection products and solutions. In addition to the

design and manufacturing of hand protection products including work gloves, Plaintiffs produce other protection products such as arm protection, body protection, foot protection, and respiratory protection. Plaintiffs also provide industrial-level safety consulting services to manufacturers located in the PRC.

39. Before issuance of the Order in April 2024, Plaintiffs produced and exported work protection gloves (among other products) to the United States. Their customers in the United States included companies from diversified industries. Plaintiffs' U.S. customers for work gloves included, but were not limited to, Milwaukee Tool, and Plaintiffs manufactured other work gloves that did not bear the Milwaukee Tool brand.

**The Wisconsin Watch Article Implicates Plaintiffs with No Evidence**

40. On November 3, 2022, an article titled "Cheng Yuan's Wife Petitions Against Milwaukee Tool for Using Slave Labor" was published on the website of BHRRC, a global non-profit organization, alleging that Milwaukee Tool used forced labor at Chishan Prison, a Chinese prison located at Yuanjiang City, Hunan Province, PRC, to manufacture its gloves. The BHRRC article does not allege that Shanghai Select or any entity within the Select Group used forced labor to produce gloves for Milwaukee Tool.

41. In response to the BHRRC article, Milwaukee Tool publicly stated on December 20, 2022, that it had conducted a "thorough investigation of these claims" and "found no evidence to support the claims being made."

42. On or about May 4, 2023, a nonprofit news outlet named Wisconsin Watch published an online article rehashing the same allegations titled "Chinese prisoners: We were forced to make Milwaukee Tool gloves for cents each day." (the "**Article**"). In the Article, a prisoner alleged that "officials forced him and hundreds of other Chishan prisoners to work

roughly 13 hours a day, seven days a week with just a few days off around the Chinese New Year" for "about 48 cents a day" and that he "later learned about the company whose brand was on the gloves, stamped with a thunderbolt and word 'Milwaukee.'" Another former prisoner recalled sewing labels with the Milwaukee Tool brand name and Wisconsin address into gloves.

43. In an apparent effort to link Plaintiffs to the alleged use of forced labor, the author of the Article, rather than contacting Plaintiffs or conducting any investigation, reviewed PRC regulatory filings and ascertained that Plaintiffs were a supplier of Milwaukee Tool gloves and further stated that "[a] self-identified salesperson of . . . Shanghai Select Safety Products[] said it manufactured the majority of Milwaukee Tool's work gloves." Based on this fact alone, the Article's author asserted that Plaintiffs had outsourced glove production to the prison. The Article went on to note that two prisoners—apparently after having been given Plaintiffs' name by the reporter—"independently identified the name of the supplier that outsourced work to Chishan Prison as Shanghai Select Safety Products," because one prisoner allegedly heard the name said by prison police and saw it on purchase orders. The other recalled hearing the name said by another prisoner who worked in a warehouse stocking gloves.

44. A later, revised version of the Article added a section about the author visiting a Chinese online marketplace, Taobao.com, to attempt to purchase Milwaukee Tool-branded gloves. *Id.* Taobao is owned by Alibaba and has been classified every year since 2016 by the Office of the United States Trade Representatives as a "Notorious Market for Counterfeiting and Piracy." According to the Article, two third-party vendors listing on Taobao informed the author that their gloves were nevertheless authentic products of Milwaukee Tool suppliers, including Plaintiffs, that had been rejected as defective.

45.	The author provided photos of Milwaukee Tool gloves being sold at two Home Depot stores in Madison, Wisconsin to the two prisoners. Both prisoners claimed they recognized thick winter models of the gloves—Winter Performance and Winter Demolition—as models they had been forced to make at the prison. Plaintiffs have never manufactured these models of gloves.

46.	On July 10, 2023, U.S. Congressman Chris Smith and Senator Jeff Merkley, members of the Congressional-Executive Commission on China, wrote a letter to the CEO of Milwaukee Tool about the allegations. The letter stated that one prisoner's spouse "has amassed evidence that political prisoners at Chishan Prison were forced to make gloves for Shanghai Select Safety Products, a supplier for Milwaukee Tool." A hearing was held on July 11, 2023. Neither the prepared materials nor the testimony given at the hearing included any evidence whatsoever regarding Plaintiffs. Although the Committee stated that it was conducting an investigation, no details of any investigative work nor any evidence that may have been collected has been publicly released, nor was the evidence allegedly "amassed" by Shi included in the hearing record.

47.	Indeed, on October 24, 2023, Congressman Chris Smith, in his opening statement during a Congressional-Executive Commission on China hearing, stated "Milwaukee Tool took action to investigate its supply chain, and I met with them last week. They discovered multiple examples of counterfeit gloves originating in the PRC bearing their brand name. Part of that lawless behavior I spoke of includes ubiquitous unauthorized, counterfeit goods."[1] Congressman Smith's statement suggests that the products in dispute are likely "unauthorized, counterfeit goods," not authorized goods produced by Plaintiffs.

48.	In August 2024, an author identified as "Stuart," who operates the tool-focused blog Toolguyd, posted a piece about the Article in which he disclosed that he had been contacted in

[1] *See* https://www.cecc.gov/sites/evo-subsites/cecc.house.gov/files/documents/2023-10-24%20%20Chairman%20Chris%20opening%20statement%20w.%20LH.pdf

February 2023 by and had spoken with the Article's author[2]. During that conversation, the author admitted that she had no evidence that Milwaukee Tool used prison labor to manufacture work gloves, nor any evidence that gloves allegedly made with prison labor were authorized rather than counterfeit. Stuart also contacted BHRRC regarding the findings of its investigation into the allegations against Milwaukee Tool's work gloves, but BHRRC did not respond. Stuart further communicated with Milwaukee Tool regarding the forced labor allegations. Milwaukee Tool responded that it had conducted an investigation and "could not find any indication or evidence that prison labor was used to manufacture its work gloves."

**Audits and Inspections of Plaintiffs' Factory Identified No Evidence of Forced Labor**

49. In the ordinary course of business, Plaintiffs permitted their business partners, including U.S. buyers and specifically including Milwaukee Tool's parent company, to conduct random and routine inspections of their production facilities. Plaintiffs made space available on the Nantong Select campus whenever inspectors arrived to perform such inspections, and none of these random inspections identified any use of forced labor by Nantong Select.

50. Plaintiffs have also been annually inspected and reviewed by Sedex, a "global non-profit organization that enables businesses to work together to better manage their social and environmental performance, and improve working conditions throughout the supply chain globally," including being subject to a SMETA audit annually since 2019. The SMETA audit is "the world's most widely used audit" that is "designed to help protect workers from unsafe conditions, overwork, discrimination, low pay and forced labor." Plaintiffs' Sedex audit reports from 2019 through 2024, all of which were provided to CBP, found no indications of forced labor at Nantong Select.

---

[2] *See* https://toolguyd.com/milwaukee-tool-forced-prison-labor-allegations/

51.     After the Article came to Plaintiffs' attention, Plaintiffs immediately retained counsel and commissioned an independent investigative team, ██████████, from Hong Kong to conduct on-site investigations and interviews. ██████████ is a Chicago-based consulting firm that maintains a presence in Hong Kong. ██████████ provides a comprehensive range of due diligence and investigation services for foreign investors who intend to partner or invest with PRC companies.

52.     ██████████ conducted an investigation including unannounced factory visits in August 2023. The final report concluded that there was no evidence that Plaintiffs had used forced labor in the production of their gloves.

**CBP Issues the Order against Select Group**

53.     On April 10, 2024, CBP issued a press release announcing the issuance of a withhold release order against Shanghai Select Safety Product Company Limited and its two subsidiaries – Select (Nantong) Safety Product Co., Ltd. and Select Protective Technology (HK) Limited. The press release deemed the Order effective as of that date. The press release provided no substantive details regarding the basis for the decision and stated only, in conclusory terms, that the Order was issued based on information that "reasonably indicates the use of convict labor . . . in the production of [Plaintiffs'] merchandise."[3]

54.     The press release provides the only notice or explanation Plaintiffs have received concerning CBP's actions or the evidence underlying the issuance of the Order. CBP has not provided further explanation or disclosed any supporting evidence to Plaintiffs, publicly or otherwise.

---

[3] A true and accurate copy of the CBP press release is attached to this Complaint as **Exhibit 1**.

55.    CBP failed to give any notice to Plaintiffs that they would be subject to the Order. CBP never conducted any public hearing, reported investigation, or adjudication regarding Plaintiffs and their labor practices prior to the Order. CBP also never contacted Plaintiffs prior to the announcement of the Order. Plaintiffs have never been afforded any opportunity to confront and address the specific factual evidence underlying CBP's decision to issue the Order.

56.    It is worth noting that, unlike the Order issued against Plaintiffs, WROs against other entities include a certain level of detail regarding their basis. For example, the WRO against Linglong International Europe D.O.O. states that the WRO was a "result of a CBP investigation and review of information that Linglong manufactures automobile tires using forced labor. CBP analyzed the following supporting evidence: worker statements, photographs, employment contracts, focus group field notes, text message screenshots, open-source non-government organization reports, news media, and academic research."[4] The WRO against Zhen Fa 7 provides that "CBP identified the following International Labor Organization forced labor indicators within Zhen Fa 7's operations: abuse of vulnerability, isolation, retention of identity documents, abusive working and living conditions, physical and sexual violence, and debt bondage."[5] The WRO against Taepyung Salt Farm also provides that "CBP identified the following International Labour Organization forced labor indicators during its investigation of Taepyung Salt Farm: abuse of vulnerability, deception, restriction of movement, retention of identity documents, abusive living and working conditions, intimidation and threats, physical violence, debt bondage, withholding of wages, and excessive overtime."[6] Likewise, a WRO against Tomatoes Produced by Farm in Mexico provides that "In October 2020, Mexican authorities took action against allegations of

[4] *See* https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-linglong-international-europe-doo
[5] *See* https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-zhen-fa-7
[6] *See* https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-taepyung-salt-farm

forced labor conditions on the same tomato farm, demonstrating the Mexican government's shared commitment to protecting the human rights of workers."[7]

57. However, unlike these WROs issued before or after the Order against Plaintiffs, the Order at issue contains no language identifying any category or type of evidence that CBP reviewed in determining to issue the Order.

**Plaintiffs Administratively Challenge the Order**

58. On April 19, 2024, Select Group's external counsel contacted CBP officials to request a call. On April 25, 2024, Select Group's counsel met with several CBP officials from the Forced Labor Division, Investigations Unit. Plaintiffs contested the validity of any forced labor allegations, including allegations of convict labor, and notified CBP of their intent to file a petition seeking revocation or modification of the Order. During the meeting, Plaintiffs' counsel further sought clarification regarding two key issues: (1) the procedural steps involved in requesting removal or modification of a WRO; and (2) the evidence CBP expected to receive in support of Plaintiffs' petition. CBP informed Plaintiffs that, although no formal procedure existed for exporters to challenge a WRO, CBP would apply the same procedures used for challenges filed by importers. However, CBP did not specify the type of evidence it would require, and instead advised Plaintiffs simply to submit their petition, after which CBP would respond. Plaintiffs also sought clarification as to whether the issuance of the Order resulted from the Article. CBP, however, refused to disclose any information underlying the Order.

59. Because CBP provided no specific guidance regarding the evidence it expected to review, and because the burden set forth by CBP had effectively amounted to having to prove a negative, Plaintiffs proposed to submit a petition reconstructing the entire production process for

---

[7] *See* https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-tomatoes-produced-farm-mexico

18

their Milwaukee Tool gloves, from raw material procurement through final exportation, and to provide CBP with a comprehensive list of transactions between Select Group and Techtronic Cordless GP ("**TTI**"), Milwaukee Tool's parent company, which placed the purchase orders for the gloves. Plaintiffs further invited CBP to randomly select any TTI transaction, for which Plaintiffs would supply supporting documentation to reconstruct the production process in the same manner as the example included in their initial petition. CBP declined to comment on whether this would be sufficient and merely instructed Plaintiffs' counsel to file their petition.

60. Plaintiffs filed a petition on July 25, 2024 seeking revocation and/or modification of the Order (the "**Petition**"). The Petition included more than 130 documentary exhibits exceeding 3,000 pages, as well as one video recording. The Petition presents clear, accurate, complete, and compelling evidence demonstrating that the Milwaukee Tool gloves exported to the United States are produced solely at the Nantong Select facility and involve no forced labor, including convict labor from Chishan Prison.

61. The Petition, together with extensive documentary evidence, detailed Plaintiffs' labor practices, including their policies and procedures, employment agreements, annual compliance audits, and inspections conducted by well-known independent third parties and Western business partners, as well as their employee compensation and benefits. The Petition provided a step-by-step walkthrough of the glove production process, as documented in extensive hand-written tracking sheets, from raw material procurement and cutting and sewing, through packaging and final exportation at the Port of Shanghai, establishing that no forced labor was involved at any stage of production, nor was there any stage where gloves left the facility or were shipped in and added to any shipment. In addition, the Petition identified all 1,262 purchase orders related to Milwaukee Tool during a five-year time period, none of which reflect or suggest the

production of any type of winter gloves that the prisoners claimed they were forced to manufacture. *See supra* ¶ 45. To demonstrate full transparency, Plaintiffs further offered to allow CBP to select any purchase orders of its choosing for reconstruction, in order to demonstrate that Plaintiffs' products were manufactured at the Nantong Select facility, not in Chishan Prison, and were not produced using convict labor.

62.     CBP failed to issue any official decision. Instead, on October 8, 2024, in response to follow-up queries from Plaintiffs' counsel, CBP issued a form letter stating, in conclusory terms, that "based on the information received, [Plaintiffs] have not provided [certain] information to help determine whether the company does not use convict labor in its production," and requested additional documentation, with particular focus on Plaintiffs' downstream suppliers and entire supply chain. Although CBP's press release stated that the purported basis for issuing the Order was "information that reasonably indicates the use of convict labor in violation of 19 U.S.C. § 1307 in the production of that merchandise," and made no reference to any supply-chain forced labor concerns, Plaintiffs nevertheless submitted a supplemental response to CBP on October 25, 2024, consisting of approximately 5,000 additional pages of documentary evidence addressing CBP's stated concerns and detailing Plaintiffs' supply chain for glove products exported to U.S. buyers.

63.     More than seven months later, and following multiple inquiries to CBP regarding the status of the Petition, CBP issued a questionnaire on May 9, 2025, which contained 41 additional requests for information and documentation that effectively expanded CBP's review into a comprehensive, five-year audit of Plaintiffs' business operations spanning the period from 2019 through 2024. These requests included, among other things, comprehensive records of all TTI sales; glove sales and inventory records; information concerning all of Plaintiffs' U.S.

20

customers; supplier information; Plaintiffs' audit practices relating to their suppliers; Plaintiffs' audited financial statements; export agent records; information and salary records for all employees regardless of involvement in glove production; Plaintiffs' general corporate ledger and accounts payable ledger.

64. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

65. Given the volume and breadth of the materials requested, Plaintiffs submitted three sets of responses, together with supplemental documentary evidence, collectively comprising more than 38,000 pages of documentary evidence.

66. On February 2, 2026, Plaintiffs' counsel again followed up with CBP to inquire about the status of the Petition. In response, CBP advised that it would issue follow-up questions to Plaintiffs "regarding some of the documents provided and related questions." CBP further stated that it "anticipate[s] that these remaining questions and clarifications will assist [CBP] in completing [its] review of [Plaintiffs' Removal Petition]." On February 10, 2026, CBP served its fourth questionnaire on Plaintiffs, requesting additional documents and information, including Plaintiffs' post-trial balance documents, which are not relevant to determining whether forced

labor was used in Plaintiffs' production processes, as well as five years' worth of documents regarding U.S. customers that did not import Milwaukee Tool gloves.

67.     Between February 19 and March 10, 2026, Plaintiffs responded to CBP's February 10 Questionnaire with additional 2,000 pages of documentary evidence, including, among other things, Plaintiffs' recruitment process, a narrative of Nantong Select's vendor selection process, and all U.S. gloves purchase orders and shipping records.

68.     Prior to filing this action, and in a good-faith effort to resolve this dispute without judicial intervention, on February 2, 2026, Plaintiffs' counsel contacted CBP to advise it of the impending expiration of the statute of limitations and Plaintiffs' intent to commence this action. However, as of the filing of this action, CBP had not issued a final determination on Select Group's Petition.

**Injuries Caused by the Order, Arbitrary and Capricious Burden Imposed to Challenge the <u>Order, and the Delay of Adjudication of Plaintiffs' Removal Petition</u>**

69.     Select Group has been harmed by Defendants' actions described above. By virtue of the Order, Select Group's gloves are automatically presumed to have been manufactured using forced labor and, therefore, cannot be imported into the United States directly or indirectly. As a result, all of Select Group's U.S. customers have ceased placing purchase orders with Select Group, resulting in cumulative business losses exceeding $36 million.

70.     The Order has caused severe harm to Select Group's reputation among its business partners and customers.

71.     Indeed, Select Group's European and other Western-country business partners have communicated their intention to cease doing business with Plaintiffs due to the existence of the Order and concerns regarding the alleged human-rights violations referenced therein. As of the

filing of this Complaint, certain European customers have canceled their purchase orders, resulting in cumulative business losses exceeding $6 million.

72. Any ability of Plaintiffs to mitigate these harms, prevent further customer losses or to regain lost customers has been improperly and unfairly delayed because of Defendants' imposition of an overbroad, arbitrary and capricious administrative challenge process and refusal to issue a decision on Plaintiffs' Petition in a reasonable time frame.

## CLAIM FOR RELIEF

## COUNT ONE

## 5 U.S.C. § 706 ISSUANCE OF THE WRO

73. Plaintiffs hereby incorporate by reference paragraphs 1 through 72 of this Complaint.

74. Plaintiffs are adversely affected and aggrieved by CBP's unlawful decision to issue the Order on Select Group without adequate evidentiary or legal basis. CBP's decision has adversely impacted Plaintiffs' ability to sell and ship goods directly or indirectly to their U.S.-based customers. *See* 5 U.S.C. § 702.

75. The Order constitutes "final agency action," 5 U.S.C. § 704, because it "mark[s] the consummation of the agency's decision making process" and "the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).

76. The APA requires courts to hold unlawful and set aside agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [.]" 5 U.S.C. § 706(2)(A). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Pub.*

*Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency acts unlawfully when it fails to "articulate a satisfactory explanation for its action.").

77. CBP's decision to issue the Order against Plaintiffs is unlawful because that determination lacks evidentiary support and because CBP failed to provide an adequate explanation for issuing the Order and failed to identify or disclose any evidentiary basis for its decision. *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[An] agency must explain why it decides any question the way it does. That obligation means that the agency must 'articulate a satisfactory explanation' of its reasoning; it may not simply provide a conclusion." (citations omitted)).

## COUNT TWO

**5 U.S.C. § 706 UNLAWFUL AND ARBITRARY AND CAPRICIOUS IMPOSITION OF BURDEN IN ADMINISTRATIVELY CHALLENGING WRO AND ACTION WITHOUT OBSERVANCE OF LAWFUL PROCEDURE**

78. Plaintiffs hereby incorporate by reference paragraphs 1 through 77 of this Complaint.

79. The Order contains no specifics or factual information beyond vague allegations of the use of convict labor, but publicly available information points to a very specific single allegation.

80. Despite the lack of any governing law or regulation, CBP has stated that a successful challenge to a WRO requires that an exporter demonstrate remediation of forced labor indicators. However, CBP has refused to identify the alleged forced labor at issue in this case and instead has subjected Plaintiffs to an indefinite and ever-expanding audit of Plaintiffs' entire business operations. Placing a burden entirely unconnected to any disclosed and identifiable

allegation of forced labor that could be "remediated" or "disproven" constitutes arbitrary and capricious action under the APA, action contrary to constitutional right of due process of law, and action without observance of procedure required by law within the meaning of the APA.

## COUNT THREE

### 5 U.S.C. § 706 UNLAWFUL DELAY OF ADJUDICATION OF WRO REMOVAL PETITION

81.    Plaintiffs hereby incorporate by reference paragraphs 1 through 80 of this Complaint.

82.    CBP's unlawful delay of its adjudication process of Plaintiffs' Petition has adversely affected Plaintiffs, as CBP's delay effectively leaves them with no means to sell and ship goods either directly or indirectly to their U.S. customers. *See* 5 U.S.C. § 702.

83.    The APA requires that CBP must conclude a matter before it "within a reasonable of time." *See* 5 U.S.C.A. § 555. If the CBP fails to do so, APA permits the court to "compel agency action unlawfully withheld or unreasonably delayed." *See id* § 706(1).

84.    19. U.S.C.A § 1515 further provides that CBP's administrative review and modification of decisions shall be concluded within "two years from the date a protest was filed."

85.    CBP's delay of nearly two years in adjudicating Plaintiffs' Petition is unreasonable.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)    Pursuant to 28 U.S.C. § 2635(d), order Defendants to file a copy of Plaintiffs' Administrative Record within forty (40) days of service of the summons and this Complaint on Defendants;

(2)    Declare that Defendants have acted in an unlawful manner in violation of the APA by unlawfully failing to provide a reasoned explanation for the Order that is supported by law and

25

evidence and by failing to provide an opportunity for Plaintiffs to confront the evidence relied upon by the agency;

(3)     Declare that Defendants have acted in an unlawful manner in violation of the APA by unlawfully imposing a burden of proof on Plaintiffs to affirmatively disprove the existence of forced labor anywhere in its supply chain, including with respect to any and all suppliers, over a multi-year period, without limitations to any specific goods, where such burden exists nowhere in applicable statutory law and is untethered to any purported factual justification for issuing the Order;

(4)     Declare that Defendants have acted in an unlawful manner in violation of the APA by unreasonable delay in adjudication of Select Group's Petition;

(5)     Vacate CBP's Order against Plaintiffs;

(6)     Compel CBP to issue an official determination on Plaintiffs' Petition within 30 days of the Court's decision;

(7)     Award Plaintiffs their attorneys' fees, expert witness fees, and all other reasonable expenses incurred in pursuit of this Action under 28 U.S.C. § 2412; and

(8)     Grant Plaintiffs such further and additional relief as this Court may deem just and proper.

Respectfully submitted

/s/ Jennifer H. Blecher
Jennifer H. Blecher
Xintong Zhang
Seiden Law LLP
322 8th Avenue, Suite 1200
New York, New York 10001
(646) 766-1763
jblecher@seidenlaw.com
xzhang@seidenlaw.com

26

/s/ Patrick C. Reed
Patrick C. Reed
Simons & Wiskin
98 Craig Road
Manalapan, New Jersey 07726
(646) 627-6229
pcr@simonswiskin.com

*Counsel for Plaintiffs*

# EXHIBIT 1

 U.S. Customs and Border Protection

**Archived Content**

In an effort to keep CBP.gov current, the archive contains content from a previous administration or is otherwise outdated.

Home　»　Newsroom　»　Announcements　»

CBP issues Withhold Release Order on Shanghai Select Safety Products and its subsidiaries

# CBP issues Withhold Release Order on Shanghai Select Safety Products and its subsidiaries

**Release Date:** Wed, 04/10/2024

*Agency will detain imports of work gloves manufactured using convict labor.*

**WASHINGTON –** Effective today, U.S. Customs and Border Protection (CBP) personnel at all U.S. ports of entry will detain work gloves manufactured by Shanghai Select Safety Products Company, Limited and its two subsidiaries from China, Select (Nantong) Safety Products Co. Limited and Select Protective Technology (HK) Limited.

CBP issued a Withhold Release Order (WRO) against Shanghai Select Safety Products Company, Limited and its two subsidiaries Nantong and HK, based on information that reasonably indicates the use of convict labor in violation of 19 U.S.C. § 1307 in the production of that merchandise. The International Labour Organization estimates that nearly 28 million workers suffer under conditions of forced labor worldwide, and WROs are a way to send a message to foreign companies exploiting workers that this will not be tolerated in U.S. supply chains. Forced labor exposes vulnerable populations to inhumane working conditions, and also hurts American workers and law-abiding businesses who cannot compete with forced labor goods that are sold below market value.

"The U.S. government sets the standard across the globe for ethical and responsible commercial transactions as we prioritize our efforts in combatting forced labor," said CBP Senior Official Performing the Duties of the Commissioner Troy A. Miller. "We continue to see the impacts of our actions as companies implement plans of action to remediate indicators of forced labor, resulting in improved living and working

conditions for laborers, and so it is essential to continue this work until we've eliminated forced labor from our supply chains."

The use of convict labor to produce goods imported into the United States in order to sell goods below market value is a violation of Section 1307, and hurts law-abiding businesses, threatens American jobs, and exposes consumers to the risk of making unethical purchases.

The WRO against Shanghai Select Safety Products Company, Limited is the latest action the United States has taken to address forced labor and other human rights abuses around the world. With this WRO issuance, CBP currently oversees and enforces 52 WROs and eight Findings under 19 U.S.C. § 1307. This law prohibits the importation of "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor, or/and indentured labor under penal sanctions . . . ," which includes forced or indentured child labor. When CBP has information reasonably indicating that imported goods are made by forced labor in violation of Section 1307, the agency will order personnel at U.S. ports of entry to detain shipments of those goods. Such shipments will be excluded or subjected to seizure and forfeiture if the importer fails to demonstrate proof of admissibility in accordance with applicable regulations.

"We have been clear that we will not tolerate any form of forced labor in U.S. supply chains," said CBP Executive Assistant Commissioner AnnMarie R. Highsmith. "We encourage like-minded partners to join us in supporting fair competition in the global marketplace."

"We continue to send a strong message to the importing community that the United States will not tolerate forced labor and human rights abuses in our supply chains," said Robert Silvers, DHS Under Secretary for Policy and Chair of the federal Forced Labor Enforcement Task Force. "CBP's actions today demonstrate that we will enforce all of our forced labor laws vigorously."

Any person or organization that has reason to believe merchandise produced with the use of forced labor is being, or is likely to be, imported into the United States, can report detailed allegations by contacting CBP through the e-Allegations Online Trade Violation Reporting System or by calling 1-800-BE-ALERT.

Follow CBP Office of Trade on X @CBPTradeGov.

---

*U.S. Customs and Border Protection (CBP) is America's frontline: the nation's largest law enforcement organization and the world's first unified border management agency. The 67,000+ men and women of CBP protect America on the ground, in the air, and on the seas. We enforce safe, lawful travel and trade and ensure our country's economic prosperity. We enhance the nation's security through innovation, intelligence, collaboration, and trust.*

# Topics

Archive Media Releases

**Last Modified: Jan 27, 2025**



## Media Contacts

### Office of Public Affairs

 [CBPMEDIARELATIONS](#)

### CBP Information Center (for non-media inquiries)

 (877) 227-5511



## Social Media Directory

View a complete list of local and regional CBP social media accounts.

**View the Directory**